UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

———————

John E. Davis, Jr., and
Marybeth Pritschet-Davis,
husband and wife,

    Plaintiffs,                                Case No.

v.

Bureau of Land Management and
Sally Jewell, Secretary of the Department
of the Interior,

    Defendants.

## Complaint for Declaratory and Injunctive Relief

    Plaintiffs, John E. Davis, Jr. and Marybeth Pritschet-Davis, through their attorneys, Beier Howlett, P.C., for their complaint, state:

### INTRODUCTION

    1.    Plaintiffs John E. Davis, Jr. and Marybeth Pritschet-Davis, husband and wife, bring this civil action for declaratory and injunctive relief against the United States Bureau of Land Management and Sally Jewell, Secretary of the Department of the Interior (collectively BLM), regarding BLM's decisions to lease federally owned mineral rights within the Allegan State Game Area, Allegan County, Michigan, for oil and gas development without analyzing the full environmental effects of the decisions.  This action arises under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and NEPA's implementing regulations.

    2.    On March 21, 2013, the Eastern States Office of BLM held a competitive oil and gas lease auction of approximately 7,500 acres in the Allegan State Game Area.  In doing so, BLM relied on an environmental assessment (EA 634) prepared pursuant to NEPA that, among

other things, inadequately addresses the impacts of the proposed lease, fails to adequately discuss the impacts of the probable use of hydraulic fracturing technology, employs faulty assumptions concerning the non-development nature of surface leases in the Allegan State Game Area, and relies on an unreliable water assessment tool in failing to discuss cumulative impacts of water consumption for likely oil and gas drilling.

3. The Eastern States Office of BLM plans to hold a competitive oil and gas lease auction of approximately 27,000 acres in the Allegan State Game Area on September 12, 2013. In proposing to do so, BLM relies on an environmental assessment (EA 1662) prepared pursuant to NEPA that, among other things, inadequately addresses the impacts of the proposed lease, fails to adequately discuss the impacts of the probable use of hydraulic fracturing technology, employs faulty assumptions concerning the non-development nature of surface leases in the Allegan State Game Area, and relies on an unreliable water assessment tool in failing to discuss cumulative impacts of water consumption for likely oil and gas drilling.

4. Plaintiffs bring this action to vacate BLM's unlawful and imprudent lease sales and to ensure that any oil and gas leasing and subsequent development be allowed only following a thorough and lawful environmental review that reveals to BLM and the public the complete impacts of such actions.

## PARTIES

5. Plaintiffs are residents of Allegan County, Michigan. Plaintiffs own 40 acres of property in Section 19, Monterey Township, Allegan County, Michigan, Town 3 North, Range 13 West. Plaintiffs' property is located adjacent to the Allegan State Game Area. Plaintiffs have imposed a conservation easement on their property in order to protect several groundwater springs, three spring-fed streams, the headwaters of Bear Creek (a tributary of the Kalamazoo

River), a wetland, a significant vernal pool, 22 bird species designated by the Michigan Department of Natural Resources (MDNR) in its Wildlife Action Plan as in decline and in need of habitat, 70 other bird species, and state-designated threatened reptiles.

6. Plaintiffs created the conservation easement in order to protect the varied habitat and abundant wildlife on their land and to enhance the natural value of the adjacent Allegan State Game Area. Plaintiffs use the Allegan State Game Area and its resources for educational, recreational and other pursuits. The Allegan State Game Area has been a central component of plaintiffs' lives for over 30 years.

7. Plaintiffs intend to continue to use and enjoy the wildlife habitat, rivers, streams and the environment of their property, the Allegan State Game Area, and surrounding areas. Plaintiffs have a pecuniary, recreational, environmental and esthetic interest in ensuring BLM complies with all applicable laws, including the substantive and procedural provisions of NEPA.

8. BLM's decisions to sell oil and gas leases in the Allegan State Game Area and surrounding areas have harmed and will harm plaintiffs' present and future interests in and use of those areas and their property. The effects of the oil and gas leases include, but are not limited to: (1) impacts to plants and wildlife and their habitats within and around the leased areas due to oil and gas activities; (2) impacts to water quality and riparian habitat; (3) impacts to water use from enormous quantities of water withdrawn for production of oil and gas; (4) impairment of recreational opportunities; (5) impairment of esthetic values; (6) emission of damaging air pollutants; (7) noise, light, odor and silica dust impacts from surface operations; (8) human health risks; (9) risks to continued viability of plaintiffs' water well; and (10) risk of groundwater contamination from surface leaks and from hazardous substances migrating up and reaching groundwater levels.

9. Defendant BLM is an agency within the United States Department of the Interior responsible for managing federal lands and subsurface mineral estates underlying federal, state and private lands. BLM's stated mission is to sustain the health, productivity and diversity of America's public lands for the use and enjoyment of present and future generations. BLM is responsible for implementing and complying with federal law, including NEPA.

10. Defendant Sally Jewell is the secretary of the Department of the Interior and is sued in her official capacity. Sally Jewell is the official responsible under federal law, including NEPA, for ensuring that the actions and management decisions of BLM comply with applicable law and regulations.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706. The relief requested is authorized by 28 U.S.C. §§ 2201-2202.

12. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

13. Venue is proper pursuant to 28 U.S.C. § 1391 because (a) a substantial part of the events, conduct or omissions giving rise to plaintiffs' claims occurred or will occur in this judicial district, and (b) the property that is the subject matter of this action is situated in this judicial district.

## NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

14. NEPA is the nation's basic charter for protection of the environment. The two principal aims of NEPA are to ensure that federal agencies consider the environmental impacts of their proposed actions and to ensure that federal agencies inform the public that environmental concerns have been considered.

15. NEPA requires the responsible federal official to prepare an environmental impact statement (EIS) to consider the effects of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). In order to determine whether the environmental impacts of a proposed action are significant enough to warrant preparation of an EIS, federal agencies may prepare an environmental assessment (EA).

16. Under NEPA's implementing regulations, an agency's EA must include "brief discussions of the need for the proposal, of the alternatives . . . , [and] of the environmental impacts of the proposed actions and the alternatives." 40 C.F.R. § 1508.9. The EA must take a "hard look" at the impacts. If the agency decides that the impacts are not significant, the agency must supply a convincing statement of reasons in support.

17. Pursuant to NEPA's implementing regulations, federal agencies must disclose if information is incomplete or unavailable and explain "the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment." 40 C.F.R. § 1502.22(b)(1). The agency must directly and expressly respond to responsible opposing views. *Id.* § 1502.9(b).

18. Federal agencies must prepare an EIS for any action that has "individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id*. § 1508.7.

19. After preparing an EA, if an agency determines an EIS is not required, the agency must provide a "convincing statement of reasons" why the project's impacts are insignificant and issue a Finding of No Significant Impact (FONSI). 40 C.F.R. §§ 1501.4, 1508.9 and 1508.13.

## FACTUAL AND PROCEDURAL BACKGROUND

**Environment of the Lease Areas**

20. EA 634 describes a Decision Area (Decision Area 634) designated by the BLM, situated in Allegan County, consisting of approximately 3,500 acres in two segments. Decision Area 634 encompasses two portions of the Allegan State Game Area each encircled by a perimeter roughly one mile wide totaling 11,900 acres, made up almost entirely of privately held land, which the BLM designated as the Development Area (Development Area 634). Development Area 634 includes private inholdings within and surrounded by the Allegan State Game Area.

21. EA 1662 describes a Decision Area (Decision Area 1662) designated by the BLM, situated in Allegan County, consisting of 127,000 acres. Decision Area 1662 encompasses approximately 50,000 acres of the entire Allegan State Game Area encircled by a perimeter roughly two miles wide of 80,000 acres, made up almost entirely of privately held land which the BLM proposal designates as the Development Area (Development Area 1662). Development Area 1662 includes private inholdings within and surrounded by the Allegan State Game Area.

22. Plaintiffs' house and land are within Development Area 634 and Development Area 1662.

23. More than 800 human drinking water wells are located in the Development Areas. Plaintiffs are informed and believe that agricultural wells are located in the Development Areas.

24. The Allegan State Game Area and much of the surrounding acreage provide important habitat for federally-listed endangered species, specifically the Indiana Bat (mammal) and the Karner Blue (butterfly), as well as a candidate species for federal listing, the Eastern Massasauga (reptile). The Decision Areas sustain at least 46 additional known plant, reptile, bird and insect species under stress due to the absence of necessary habitat. These species appear on federal listings as threatened and on state listings as endangered, threatened or species of concern.

25. The MDNR listed a large number of additional species which are known to occur in the Allegan State Game Area and in the surrounding Development Areas in its Wildlife Action Plan, the purpose of which is to prevent those species from becoming endangered.

26. Bald eagles, golden eagles and osprey use the Allegan State Game Area and surrounding acreage in the Development Areas.

27. The Decision Areas are located primarily in the Kalamazoo River watershed but also extend into the Black River watershed. The State of Michigan has formally designated the lower Kalamazoo River that runs through the Allegan State Game Area, along with one of its tributaries, Swan Creek, as Natural Rivers.

28. Plaintiffs are informed and believe that in addition to its undisturbed nature, the primary reason for the abundance of flora and fauna in the Allegan State Game Area and in much of the acreage in the wider Decision Areas is the sheer diversity and abundance of surface water features. In the Allegan State Game Area alone there are nine lakes, trout streams, creeks, significant and profuse open vegetated wetlands, numerous springs, vernal pools and wet woods. Plaintiffs' land in the Development Areas is seamless with the Allegan State Game Area, repeating similar water features such as a vernal pool, springs, wetlands, and wet woods, stitched

together by streams that flow westward, uninterrupted, into the Allegan State Game Area, and ultimately into the Kalamazoo River.

29. The Allegan State Game Area contains three wildlife sanctuaries where human access is prohibited. Plaintiffs are informed and believe that the BLM has included acreage on three sides of one of the sanctuaries in Development Area 1662. A portion of Development Area 1662 also is situated in close proximity to the two remaining wildlife sanctuaries in the Allegan State Game Area.

30. Plaintiffs' footprint on their land is small; their land, therefore, functions as a *de facto* wildlife sanctuary.

31. The MDNR has not limited its leasing of state mineral rights in the Allegan State Game Area to nondevelopment leases. The MDNR has entered into leases in the Allegan State Game Area with oil and gas companies that are classified as development with restrictions. Plaintiffs are informed and believe that development leases with restrictions are intended by the parties for placement of drill pads. Some of these existing state development with restrictions leases are situated on state surface lands contiguous with plaintiffs' land. Plaintiffs are informed and believe that the restrictions contemplated in these development leases with restrictions will likely be limited only to distance requirements from existing inhabited houses.

**Habitat Contamination from Oil Spills**

32. Oil and gas development under the lease sales is likely to have several impacts on wildlife and other natural resources. Surface spills of oil, gas or brine are ordinary and frequent effects of oil and gas development. Such spills can pollute, impair or destroy wildlife, insects and other natural resources by damaging fur and feathers, killing and coating needed vegetation, causing ingestion of hazardous substances in surface water and on vegetation and soils, and

decreasing or impairing nutrients in water supply. The impacts of such spills can last for decades.

33. Waste brine from oil and gas operations is routinely spread on roads for dust and snow control. Such waste brines often contain hazardous substances derived from oil and gas drilling such as benzene, toluene, ethylbenzene, and xylenes, which are listed as hazardous substances pursuant to both federal and state law.

**Hydraulic Fracturing**

34. Lessees of BLM's lease sales may use a technique for recovering oil and gas known as slickwater high volume horizontal hydraulic fracturing (commonly known as "fracking") to develop the oil and gas from the leases.

35. Fracking is a controversial and frequently dangerous method of drilling for oil and gas. Fracking involves injecting highly pressurized fluid and other materials through perforated drill casings into rock formations to cause fractures in underground rock layers that will allow the release of oil and natural gas not recoverable through ordinary oil and gas drilling methods.

36. Fracking requires the use of extraordinarily large amounts of water. EA 634 observes that existing fracking operations in Michigan used six million gallons in 15 staged fractures. EA 1662 observes that fracking in Decision Area 1662 would consume, based upon BLM's unrealistically conservative assumptions, 60 million gallons to 300 million gallons for the ten to 50 wells that EA 1662 assumes will be drilled, all at the rate of six million gallons per each lateral leg of each well. The process of fracking can involve multiple lateral legs from each well pad.

37. Fracking can result in the discharge of hazardous substances, including petroleum constituents such as benzene, toluene, ethylbenzene, and xylene, into drinking water. Fracking

requires the use of many hazardous substances, which may reach water supplies by multiple means, including surface spills, casing failure, blow-outs and risks associated with waste fluid disposal in deep injection wells.

38. Fracking pollutes the air. Fracking operations can result in the emission of volatile organic compounds (VOCs), such as benzene, toluene, ethylbenzene, and xylene, which cause substantial negative health effects. Ancillary equipment used for production of oil and gas includes massive diesel engines (a) to drive drill bits long distances through hard rock formations, (b) to force mixtures of sand, water and chemicals at pressures high enough to fracture rock, and (c) to drive diesel trucks, among other things. These massive diesel engines emit several air pollutants, such as oxides of nitrogen, sulfur dioxide, carbon monoxide and particulate matter. Oil and gas production surface infrastructure includes condensate tanks which emit similar air pollutants.

39. Oil and gas well production equipment located on the surface leaks significant amounts of methane into the air. In some cases, operators flare methane directly into the air. Methane emissions contribute to smog and significant deterioration of air quality.

40. Fracking will likely be used in the Development Areas because the targeted zones include the Trenton-Black River formation and the overlying Collingwood shale. Shallower formations are unlikely targets for current exploration. Deeper formations in Michigan, such as the Trenton-Black River formation and Collingwood shale, are now actively being developed through fracking.

**BLM's Lease Sales and Environmental Assessments**

41. EA 634 is dated September 2012. EA 634 arises from "expression of interest" 634 by confidential proponents with a total project acreage of 6,470 acres.

42. For EA 634, BLM conducted external scoping because BLM had limited knowledge of the area. BLM corresponded with MDNR staff and followed up with a conference call on October 12, 2011 to identify issues. BLM consulted with federally recognized Indian tribes in or about May 2012. Between the October 2011 conference call between BLM and MDNR and issuance of EA 634 in September 2012, plaintiffs are informed and believe that BLM provided no public notice in any medium concerning the preparation of EA 634 nor solicited public comment on EA 634.

43. Plaintiffs are informed and believe that BLM did not notify the public of the availability of a draft EA for the proposed sale of oil and gas leases described in EA 634.

44. For EA 634, BLM issued its notice of competitive lease sale, oil and gas, on December 21, 2012 for a lease sale to be held on March 21, 2013. At the lease sale, BLM sold 6,976.50 acres, rather than the 6,470 acres described in EA 634.

45. For EA 634, BLM issued its FONSI on May 6, 2013, after the lease sale.

46. EA 1662 is dated March 2013. EA 1662 arises from "expressions of interest" 1662, 1664, 1665, 1666, 1667, 1668, 1669, 1670 and 1673, by confidential proponents with a total project acreage of 27,302 acres.

47. For EA 1662, BLM conducted external scoping because BLM had limited knowledge of the area. BLM met with MDNR staff at the Allegan State Game Area on May 19, 2011 and followed up with a conference call on October 12, 2011 to identify issues. BLM started consultations with federally recognized Indian tribes by letter dated February 7, 2013. Between the May 2011 meeting between BLM and MDNR and issuance of EA 1662 in March 2013, plaintiffs are informed and believe that BLM provided no public notice in any medium concerning the preparation of EA 1662 nor solicited public comment on EA 1662.

48. Plaintiffs are informed and believe that BLM did not notify the public of the availability of a draft EA for the proposed sale of oil and gas leases described in EA 1662.

49. For EA 1662, BLM issued its FONSI on June 12, 2013 and issued its Decision Record on June 12, 2013.

50. For EA 1662, in a notice posted on the BLM website on June 14, 2013, BLM issued its notice of competitive lease sale, oil and gas, and set a date for the lease sale of September 12, 2013.

51. Immediately upon learning about EA 634 and EA 1662 and related lease sales, plaintiffs began gathering information in an effort to understand the implications and effects of these actions. On July 27, 2013, within days of learning about the lease sales, plaintiffs faxed a letter to BLM's Northeastern States Field Office in Milwaukee, Wisconsin protesting both lease sales and providing reasons why EA 634 and EA 1662 are deficient (attached as Exhibit 1).

52. EA 634 and EA 1662 fail to analyze or discuss many environmental impacts arising from the lease sales.

53. EA 634 and 1662 rest on the faulty assumption that oil and gas development in the Allegan State Game Area will never occur on surface lands. This faulty assumption is based on the representation by MDNR that oil and gas leases in the Allegan State Game Area are "non-development". Practice in Michigan, however, is that surface disturbance can occur from (a) entities servicing well pads, (b) oil and gas lessees obtaining permits from the Michigan Department of Environmental Quality (MDEQ), and (c) such lessees obtaining amendments to reclassify lands from non-development to development. Such reclassification occurs routinely. MDNR is already a lessor of leases in the Allegan State Game Area classified as development with restrictions.

54. EA 634 and EA 1662 fail to analyze likely impacts from the forecast of up to 300 million gallons of water used in probable fracking operations in the Development Areas. Both EAs fail to analyze where this water will come from and where the polluted waste water will be disposed of or released. Neither EA discusses any environmental effects of these withdrawals or disposals. Neither EA discusses effects on existing water wells used for residential and agricultural purposes in the Decision Areas. Neither EA discusses the probable scenario of the need for using over 20 million gallons for each lateral leg of fracking production wells, which can result in cumulative water consumption of more than one billion gallons of water permanently withdrawn from the water cycle for each fracking production well.

55. Both EAs place great confidence in the Michigan water withdrawal assessment tool, but do not discuss either the reliability or assumptions of this device. Nor do the EAs discuss routine authorization by Michigan regulators of high volume water withdrawals, notwithstanding adverse impacts from such withdrawals indicated by this device. Nor do the EAs consider the cumulative effects of such high volume withdrawals or the fact that the water withdrawal assessment tool looks at one permit request at a time rather than cumulative effects.

56. EA 1662 does not discuss the environmental effects of concentrating all of the well pads and associated drilling activity and service infrastructure in the Development Area 1662, including those portions of Development Area 1662 that are private inholdings within and surrounded by the Allegan State Game Area. These environmental effects will necessarily result from the asserted restriction in EA 1662 of surface use in the Allegan State Game Area.

## FIRST CLAIM FOR RELIEF

**Preparation of Unlawful EAs and FONSIs**

57. Plaintiffs adopt by reference all previous allegations in this complaint.

58. BLM must take a "hard look" at the consequences, environmental impacts, and adverse effects of the proposed action. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9.

59. BLM failed to take a hard look at the consequences, environmental impacts, and adverse effects of its actions in relation to water consumption and water disposal required by fracking, assumptions concerning non-development of leased areas within the Allegan State Game Area, concentration of surface use in the Development Areas, impact on wildlife and habitat within the Decision Areas, and BLM's inability to consider a full range of options for dealing with surface activities in the Development Areas once it sells the leases.

60. BLM failed to take a hard look at cumulative impacts of the oil and gas leases offered for sale.

61. BLM failed to take a hard look at air pollution that will be caused by the leasing and the effect on air quality in Allegan County.

62. BLM failed to take a hard look at impacts to water quality from water consumption required by fracking and water disposal from oil and gas activities.

63. BLM failed to take a hard look at impacts to wildlife, their habitats and other natural resources resulting from oil spills and contamination arising from oil and gas activities.

64. BLM's issuance of the inadequate EAs and the unlawful FONSIs for the lease sales is arbitrary, capricious and not in accordance with the law as required by NEPA and NEPA's implementing regulations. BLM's issuance of the inadequate EAs is subject to judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (APA).

## SECOND CLAIM FOR RELIEF

**Failure to prepare EISs**

65. Plaintiffs adopt by reference all previous allegations in this complaint.

66. BLM violated NEPA by authorizing both lease sales without preparing an EIS for each lease sale. Each lease sale is a major federal action significantly affecting the quality of the human environment. BLM's failure to prepare an EIS before holding the lease sale was arbitrary, capricious, and a violation of law. 42 U.S.C. § 4332(2)(C).

67. NEPA's implementing regulations list ten factors that must be considered in determining the significance of an action's environmental effects. 40 C.F.R. § 1508.27. Among these factors are the degree to which the action affects public health and safety (such as impacts on domestic water wells and agricultural wells), unique characteristics of the area, proximity to wild and scenic rivers such as the natural river segments in Allegan County, the degree to which effects on the quality of the human environment are likely to be highly controversial, the degree to which possible effects are highly uncertain or involve unique or unknown risks, the degree to which the action may establish a precedent for future actions, and the relation of the action to other actions that may have cumulatively significant impacts. The presence of any of these factors makes BLM's decision not to prepare an EIS for each lease sale arbitrary, capricious, and a violation of law.

68. Oil and gas development in or near the Allegan State Game Area will adversely affect public health and safety; the lease sales will affect an area with unique characteristics; the environmental impacts from fracking are highly controversial; the environmental impacts are highly uncertain and involve unique and unknown risks; the lease sales may establish precedents for future actions with significant effects, and the actions are related to other actions with cumulatively significantly impacts. 40 C.F.R. § 1508.27(b). These significant effects require BLM to prepare EISs for the lease sales.

69. BLM's sale and proposed sale of the oil and gas leases without preparing EISs are arbitrary, capricious, and not in accordance with the law as required by NEPA and its implementing regulations, and are subject to judicial review under the APA.

### THIRD CLAIM FOR RELIEF

**Failure to provide notice and public involvement**

70. Plaintiffs adopt by reference all previous allegations in this complaint.

71. BLM violated NEPA and its implementing regulations by failing to insure that the EAs were available to public officials and citizens before finalization of the EAs and issuance of the FONSIs. 40 C.F.R. § 1500.1(b).

72. BLM violated NEPA and its implementing regulations by failing to encourage and facilitate public involvement in decisions which affect the quality of the human environment. 40 C.F.R. § 1500.2(d).

73. BLM violated NEPA and its implementing regulations by failing to provide public notice and public availability of the EAs so as to inform those persons, agencies and public officials who may be interested or affected. 40 C.F.R. § 1506.6(b).

74. BLM violated NEPA and its implementing regulations by failing to provide public notice in a manner that would be expected to reach local government officials, potentially interested community organizations, potentially interested persons, and occupants of nearby or affected properties. 40 C.F.R. § 1506.6(b)(3).

75. BLM's sale and proposed sale of the oil and gas leases without providing appropriate public notice are arbitrary, capricious, and not in accordance with the law as required by NEPA and its implementing regulations, and are subject to judicial review under the APA.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

A. Declare that BLM violated NEPA and the APA in (1) issuing EA 634 and its accompanying FONSI for the March 21, 2013 lease sale for the Allegan State Game Area, and (2) issuing EA 1662 and its accompanying FONSI for the September 12, 2013 lease sale for the Allegan State Game Area.

B. Declare that BLM violated NEPA and the APA by (1) failing to prepare an EIS before holding the March 21, 2013 lease sale for the Allegan State Game Area, and (2) failing to prepare an EIS before holding the September 12, 2013 lease sale for the Allegan State Game Area.

C. Issue an order setting aside as unlawful the March 21, 2013 lease sale for the Allegan State Game Area and the September 12, 2013 lease sale, if it is held, the underlying EAs and FONSIs, and any leases issued pursuant to such sales.

D. Award plaintiffs the cost of this action, including reasonable attorney fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

E. Grant such other relief as the court deems equitable, just and appropriate.

Dated: September 5, 2013                BEIER HOWLETT, P.C.

                                        By *s/ Jeffrey K. Haynes*
                                            Jeffrey K. Haynes (P25140)
                                            Keith C. Jablonski (P62111)
                                        Attorneys for Plaintiffs
                                        200 E. Long Lake Road, Suite 110
                                        Bloomfield Hills, MI  48304
                                        jhaynes@bhlaw.us.com
                                        (248) 645-9400